# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 24-295

STATE OF LOUISIANA

VERSUS

MARKUS O. ANDREWS

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 21-257573
HONORABLE SUZANNE M. DEMAHY, DISTRICT JUDGE

**********

## GARY J. ORTEGO
## JUDGE

**********

Court composed of D. Kent Savoie, Gary J. Ortego, and Ledricka J. Thierry, Judges.

**AFFIRMED.**

**Hon. M. Bofill Duhe**
**District Attorney**
**17th Judicial District Court**
**W. Claire Howington**
**300 Iberia St., #200**
**New Iberia, LA 70560**
**(337) 369-4420**
**COUNSEL FOR APPELLEE:**
 **State of Louisiana**

**Edward Kelly Bauman**
**LA Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
 **Markus O. Andrews**

**ORTEGO, Judge.**

In this matter, on October 29, 2021, Defendant, Markus O. Andrews, was charged by bill of information with five counts of attempted first degree murder, in violation of La.R.S. 14:27 and 14:30(A)(1). On July 13, 2023, the jury unanimously found Defendant guilty as charged. On March 7, 2024, the trial court sentenced Defendant to eighteen years at hard labor without the benefit of probation, parole, or suspension of sentence for each count of attempted first degree murder. The trial court also ordered all sentences to run concurrently. Defendant timely appeals his convictions and sentences. For the following reasons, we affirm his convictions and sentences.

## FACTUAL AND PROCEDURAL HISTORY

On October 29, 2021, Defendant, Markus O. Andrews, was charged by bill of information with five counts of attempted first degree murder, in violation of La.R.S. 14:27 and 14:30(A)(1). Defendant subsequently pled not guilty to all charges.

On April 6, 2022, Defendant, through defense counsel, filed a motion for the appointment of sanity commission and a motion for mental examination as to sanity at the time of offense and his ability to understand the proceedings against him and assist in his own defense, which the trial court granted. On July 11, 2022, following a sanity hearing, the trial court found Defendant competent to proceed to trial.

On July 12, 2023, a trial by jury commenced solely on the attempted first degree murder charges. On July 13, 2023, the jury unanimously found Defendant guilty as charged. Thereafter, Defendant filed a motion for post-verdict judgment of acquittal and a motion for new trial, which the trial court denied.

On March 7, 2024, the trial court sentenced Defendant to eighteen years at hard labor without the benefit of probation, parole, or suspension of sentence for each count of attempted first degree murder. The trial court also ordered all sentences to run concurrently.

Defendant now appeals his convictions and sentences

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find one error patent.

The trial court did not accurately advise Defendant as to the time period for filing post-conviction relief. At sentencing, the trial court advised Defendant that he had "two years from the date your conviction becomes final to apply for any post-conviction relief[.]"[1] According to La.Code Crim.P. art. 930.8(A) (emphasis added), the time period for filing post-conviction relief is "two years after the *judgment of conviction and sentence* has become final[.]" Thus, we find the advice given at sentencing was only partially accurate. In *State v. Hudson*, 23-760, p. 2 (La.App. 3 Cir. 5/8/24) (unpublished opinion) (2024 WL 2046021), this court found the trial court's advice that Hudson had "'two years from the date this conviction becomes final to file an application for post-conviction relief'" was inadequate. *See also State v. Wilhite*, 55,023, p. 21 (La.App. 2 Cir. 5/17/23), 361 So.3d 1246, 1258, *writ denied*, 23-847 (La. 3/5/24), 379 So.3d 1271; *State v. Robertson*, 53,970, p. 18 (La.App. 2 Cir. 6/30/21), 322 So.3d 937, 947; and *State v. Simpson*, 50,334, p. 19 (La.App. 2 Cir. 1/13/16), 186 So.3d 195, 206–07.

---

[1]According to the minutes of sentencing, the trial court advised Defendant that he had two years from the date his "sentence" became final to seek post-conviction relief.

Considering these cases, this court instructs the trial court to inform Defendant of the correct provisions of article 930.8 by sending appropriate written notice to him within ten (10) days of the rendition of this opinion and to file written proof that Defendant received the notice in the record of the proceedings. *State v. Green*, 21-14, p. 4 (La.App. 3 Cir. 10/27/21), 329 So.3d 917, 921.

## ASSIGNMENTS OF ERROR

Defendant assigns four errors:

1. The evidence presented at trial, when viewed in the light most favorable to the prosecution, was insufficient to find Markus Andrews guilty of attempted first degree murder beyond a reasonable doubt.

2. The trial court's comments, remarks, interruptions, and admonishment of Defense counsel violated Mr. Andrews' constitutional right to a fair trial and effective assistance of counsel.

3. The trial court erred in denying Defense counsel's *Batson* challenge.

4. The trial court erred in imposing constitutionally excessive sentences and in failing to give sufficient consideration to Art. 894.1.

## EVIDENCE PRESENTED AT TRIAL

As defendant has contested the sufficiency of the evidence at trial, we will review the testimony presented at trial.

Deputy Nicholas Olander of the St. Martin Parish Sheriff's Office testified on July 17, 2021, at around 1:20 a.m., he responded to a call regarding a car being struck by gunfire on Interstate 10 (I-10). Upon arrival, Deputy Olander located the victims on the side of the interstate near mile maker 112 between Breaux Bridge and Henderson. According to Deputy Olander, there were five victims in the

3

vehicle, including two juveniles. Since he was unable to stop the flow of traffic on the interstate, Deputy Olander instructed the driver to move the vehicle to a nearby gas station to ensure everyone's safety. Thereafter, Deputy Olander inspected the vehicle and noticed three impact marks, which he believed were consistent with gunshots.

Carla Mendez, the mother, testified that at the time of the shooting, she, her husband, and her three children were traveling from California to Baton Rouge, Louisiana, for an International Youth Conference. According to Mrs. Mendez, her 21-year-old son Eddie was driving at the time of the shooting, and she was next to him in the front passenger seat. Her son Jacob was seated in the backseat directly behind her on the passenger's side, while her husband was seated directly behind the driver's side seat. Sophia, the youngest child, was sitting in the back middle seat. Ms. Mendez stated that while they were traveling on the interstate, they heard noises and then the front passenger window shattered. Ms. Mendez testified that at first she assumed rocks hit the window. However, whenever her husband and son got out and inspected the vehicle, they noticed that someone had just shot at them in their car. Ms. Mendez testified she observed that their vehicle had bullet holes in the passenger's side back light, the passenger's side door, the dashboard, and the front passenger window. Ms. Mendez noted at the time of the shooting the only vehicles that passed them were a small car and a semi-truck.

Jacob Coreas, who was sixteen at the time of the incident, testified he was sitting in the backseat when he was "startled" by "some thuds on the car, from behind the car, and then, eventually, this, kind of cracking sound at the window." After the shooting, he, his father, and his brother examined the vehicle and noticed there were holes in the taillight, the rear door, and in between the windows, all on the passenger's side of their vehicle. According to Jacob, there was no damage to

4

the vehicle prior to the incident. Jacob recalled seeing only a semi-truck and the taillights of an unidentified vehicle immediately after the shooting.

Next, Eddie Coreas testified regarding his recollection of the events that occurred that night. According to Eddie, he was driving in the left lane at approximately 79 to 80 miles per hour when a dark Kia Soul suddenly started tailgating them. Eddie stated as the car passed them, they heard noises and saw the front passenger window shatter. Eddie further testified that the Kia Soul and a semi-truck were the only vehicles on the interstate at the time of the incident. At first, Eddie thought rocks had hit the window, so he pulled over, and he and his dad inspected the vehicle. While they were inspecting the vehicle, they noticed bullet holes in the taillight, passenger door, and passenger window. They called the police and notified them of what had happened, and it took them approximately five to ten minutes after the shooting occurred to contact the police. Eddie also testified that he was the only person in the vehicle to get wounded, as glass shards got lodged in his leg.

Detective Charles ("Chuck") Scott of the St. Martin Parish Sheriff's Office testified that he assisted Detective Vicki Lagrange by researching the license plate recognition (LPR) cameras to identify the vehicle that passed the victims on the interstate. According to Detective Scott, the closest LPR camera to mile marker 112 where the shooting occurred was located at mile marker 113.5. Detective Scott stated he retrieved the camera footage from mile marker 113.5 and then viewed the footage about ten to fifteen minutes prior to the 911 call to see what vehicles passed. Detective Scott further testified that the LPR camera showed a vehicle traveling on the interstate about a mile and a half from the scene at 1:11 a.m., just minutes after the shooting, which placed the Kia Soul at the scene of the shooting. Detective Scott testified that there was not any entrance or exit ramps

5

between mile markers 112 and 113.5. Detective Scott then ran the license plate number of the vehicle in the National Crime Information Center (NCIC), which verified the vehicle shown on the LPR camera was a black Kia Soul, which Detective Scott learned that the vehicle was owned by a rental car company located in Atlanta, Georgia.

Detective Scott further testified that he used the LPR system to obtain the whereabouts of the vehicle before the incident, stating:

> A      . . . I expanded the search for that particular license plate to see if it had been in our area. And, there is [sic] other cameras further West on I-10, so, my focus was to see if that vehicle had been following our victim, to try and establish a route that they may have traveled together. So, when I did that, I came up with some daytime images, which are a lot clearer. You can actually see that it's a black Kia Soul, same license plate, on the 16th, which a lot of those reads were in Lafayette [P]arish the day before the incident.
>
> Q      Were you able to determine where the vehicle was -- the LPR system, able to determine where that vehicle had been prior to the incident?
>
> A      Yes, I was.
>
> Q      Where was that?
>
> A      At 12:57 p.m., it hits on US 90, Evangeline Throughway, near the Lafayette airport. It hit two LPRs, back-to-back, at 12:57.
>
> Q      So, that would indicate what?
>
> A      It would indicate that that's where the vehicle was at the time and it basically --
>
> Q      Would it give you a direction of travel? You're saying it hit two LPR systems, back-to-back?
>
> A      Yes.
>
> Q      Could you establish a direction of travel of the vehicle from that?
>
> A      Yea. It was traveling north on Evangeline Throughway, in the direction of I-10.

Q      That would have been -- what time was that?

A      12:57 a.m. I think I said p.m. earlier, but, I corrected myself. It was 12:57 a.m.

Q      Yes. It's morning, essentially. Is that consistent with the LPR reader reading it at 1:11 in the morning, on I-10?

A      Yea. It's reasonable. However, the estimated speed -- I think the person would have been traveling higher than the posted speed limit because it's basically, three minute -- you're looking at fourteen minutes, which is possible, but, in my opinion, I think the person driving was driving pretty fast.

Q      When you say, it's possible, the LPR -- they track him here, then, they track him there (indicating). So, is there any --

A      It's definitely in that direction. Yeah. It's definitely possible to be -- I mean, and it's the same -- I've never had this not read -- I mean, it's the same vehicle. There is no denying that it's the same vehicle. Same license plate.

Detective Vicki Lagrange of the St. Martin Parish Sheriff's Office, who was the lead investigator in the case, testified that on the night of incident, she responded to a call regarding a drive-by shooting.  Detective Lagrange stated she met the victims at a gas station right off the interstate in Henderson, and whenever Detective Lagrange arrived at the gas station, she spoke with the victims and inspected their vehicle, which she identified as a Toyota Camry.  According to Detective Lagrange, there were four bullet holes found in the victims' vehicle: one in the passenger taillight, one in the passenger side door, one in the passenger window frame, and one bullet hole through the front passenger window.  Detective Lagrange testified that the impact marks/holes found on the victims' vehicle were consistent with gunshots, and based upon her experience in law enforcement she knew the holes were bullet holes.

Thereafter, Detective Lagrange discussed her findings after processing the vehicle.  According to Detective Lagrange, she found a bullet fragment in the black rubber between the door handle and the door opening.  Detective Lagrange stated

7

that she was only able to recover one bullet fragment because the others more than likely fell out on the interstate. Detective Lagrange further testified she was able to determine the trajectory of the bullets based upon the bullets' directions of travel. According to Detective Lagrange's testimony the bullets came from behind and on the right side of the victims' vehicle, which indicated the driver of a passing vehicle would have been the shooter.

After Detective Lagrange inspected the vehicle and spoke with the victims, she secured the bullet fragment and brought it to Acadiana Criminalistics Laboratory (ACL) to have it processed.[2] Detective Lagrange also provided Detective Scott with a description of the vehicle, wherein Detective Scott was able to locate the vehicle, a black Kia Soul, and obtain the vehicle's license plate number.

According to Detective Lagrange, she also obtained information that the black Kia Soul was seen driving on Verot School Road at 12:57 a.m., which was approximately fourteen minutes from exit 109 in Breaux Bridge. After putting the license plate number into the database, Detective Lagrange also learned the vehicle was registered to a rental company in Atlanta. Detective Lagrange then contacted the rental company, and obtained the name of the renter, which was the Defendant, Markus Andrews. According to the rental company, Defendant rented the car in April and the return was in May, however, he failed to return the rental.

After Detective Lagrange received Defendant's name from the rental car company, she researched him in a law enforcement database and discovered that he had been arrested in St. John the Baptist Parish approximately an hour after the shooting. Detective Lagrange subsequently called St. John the Baptist Parish,

_____

[2]The ballistics report determined that the bullet fragment lacked "sufficient barrel markings for comparison and was not suitable for identification with any firearm."

received information regarding Defendant's arrest, and obtained a copy of a 911 call Defendant made to the St. James Parish Sheriff's Office.[3]

The following colloquy as to Defendant's called 911 at 2:17 a.m. was as follows:

Q       What's the time frame from that and this?

A       It's a little over an hour.

Q       So, he continued to travel on I-10?

A       That is correct. The time would match. After speaking to the victim, he did admit that he was speeding. He said he was traveling, approximately, seventy-nine to eighty miles per hour. When the vehicle passed him up, the vehicle was speeding, which would make sense that he made it to that area in about an hour.

Q       Right. You know that he was -- from that LPR, you know that he was at a certain location at 1:11. Right?

A       Absolutely. Yes.

Detective Lagrange further testified as follows:

Q       What do you know about the continuation of this?

A       After I got the phone call, I also contacted the jail. They told me that he was released. After I called, I was able to make contact with the officer . . . who came in contact with that vehicle, which was Detective Michael Dean. And, Micheal Dean was able to tell me that he stopped the vehicle.

. . . .

Q       After talking to him, without telling me what he said, can you tell me, based on your conversation, what you did next?

A       Yes. I was able to locate the vehicle, which was towed to a wrecker yard.

Q       And, you were able to go and view the vehicle?

---

[3]According to Detective Lagrange, Defendant made the 911 call while traveling through St. James Parish but subsequently was arrested in St. John the Baptist Parish.

9

A      Yes. I was able to obtain a search warrant through St. John the Baptist, in the jurisdiction where the vehicle was.

. . . .

Q      Did you, in fact, collect any evidence?

A      I did.

Q      Tell me what you collected? Not just you. Give me, in total, what did you -- any evidence that you obtained of [sic] St. John the Baptist [P]arish.

A      On the morning the incident took place, Detective Dean was able to see an AK 47 from the black Kia Soul that was occupied by Markus Andrews. He also located three spent rounds, which is [sic] the casings. Three casings of the AK 7.62's inside that vehicle, which he secured and later, was [sic] given to me and I placed into evidence.

Detective Lagrange further testified that during their investigation they also found a .22 shell casing and boxes with Defendant's name on them in the Kia Soul. After the search of the vehicle, Detective Lagrange secured an arrest warrant for Defendant.

Detective Lagrange stated that upon arrest Defendant refused to speak with her, so she secured a warrant to search the contents of Defendant's cellphone. Detective Lagrange testified messages on Defendant's phone were found where Defendant told another person that "he was ran down by some people on the highway," which he stated required him to fire on that person. Defendant, himself, made a 911 call at 2:17 a.m., which was approximately an hour from the scene of the shooting where he stated he had been involved in a shooting on the highway.

On cross-examination, Detective Lagrange elaborated more on the 911 call Defendant made, stating:

Q      . . . Y'all also discussed that Mr. Andrews reported that he was being fired upon?

A      Yes.

10

Q      Tell us about that.

A      He said that somebody was shooting at him[,] and he had to shoot back, which places him shooting -- firing a firearm.

Q      Where?

A      He was on the Interstate when he made that call, saying somebody had shot at him, and he had to shoot back.

Q      But, he didn't place that phone call until he got to St. James [P]arish.

A      That is correct.

Q      Is there anything else in that phone call that you found important?

A      Yes. He said that there was [sic] twenty to forty people following him. And, I know, at the time the black Kia Soul passed my victim's vehicle, there was [sic] no vehicles on the road, other than, the semi-truck that was in front.

Thus, Detective Lagrange's testimony, along with the evidence and photographs of the victim's vehicle, confirmed the testimony of the victims that Defendant shot at their vehicle as he passed them in the right lane of I-10 in the dark Kia Soul that he was apprehended driving later that night.

Lieutenant Michael Dean of the St. John the Baptist Parish Sheriff's Office testified he made contact with Defendant around 2:30 a.m., which was after the shooting. Lieutenant Dean stated while he and another deputy were patrolling, they received a call regarding a shooting that occurred between two vehicles on I-10. Lieutenant Dean stated as he was travelling towards I-10, he noticed a Kia Soul exiting the interstate. According to Lieutenant Dean, no other vehicles appeared to be around or behind the Kia Soul.

Lieutenant Dean then testified as follows:

A      . . . I turned around and notified dispatch and other units, that were already coming to the area, that the black Kia Soul was traveling Southbound on Belle Terre Boulevard at a high rate of speed. I activated my emergency lights and sirens on my unit, at which time

11

the black Kia Soul continued to travel Southbound on Belle Terre Boulevard, disregarding the lights and sirens. He ran the red light at Belle Terre Boulevard and St. Andrews Boulevard, continuing Southbound. The next intersection is the intersection of Fairway Boulevard and Belle Terre Boulevard. There is a red light there. There were numerous marked and unmarked units already sitting in that area by that red light with all of their lights on. He continued through that intersection, ran another red light and continued Southbound on Belle Terre Boulevard. Numerous units, besides myself [sic], converged on the vehicle. We tried to initiate a rolling road block, which would be suspect vehicle, my unit, and we try to get units beside it and in front of it. And, once we do that, it's a box-in technique. We gradually slow down to make them stop. Well, we couldn't get anybody to the right hand side because he was in the right lane. At that point, he drove off the roadway into a grassy lot to try to get around the lead car, but, was forced back on to Belle Terre, due to a wooden fence by a business. At that point in time, we were finally able to get the vehicle to stop. We conducted a felony vehicle stop on it, ordered the driver out, at which time, a solo black male exited the vehicle. He provided his name of Markus Andrews to myself [sic], as he was detained and advised of his Miranda Rights. As we tried to approach the car to see if there was [sic] any other suspects in the vehicle, there were three very large pit bulls in the vehicle that prevented our further advancement on the vehicle. So, we backed off and called for Animal Control to come, which took almost two hours to get there. So, we sat on this car for two hours with three large pit bulls, rocking this Kia Soul.

Q    So, there was one occupant in the car?

A    Yes, ma'am.

Q    And, that occupant was obviously the driver?

A    Yes, ma'am.

Lieutenant Dean stated after the pit bulls were removed from the vehicle, they searched the vehicle and noticed a "AK 40-style pistol, commonly referred to as a Draco style" pistol on the driver's side floorboard and a black cylindrical object, which was consistent with a suppressor. Lieutenant Dean further testified they also found three 7.62x39 shell casings in the vehicle, which were consistent with an AK-47 round. Lieutenant Dean also stated they found a .22 spent casing in the passenger side door. However, Lieutenant Dean noted they were unable to

locate a firearm that was compatible with the .22 projectile during the search of the vehicle.

Lieutenant Dean further testified:

Q   . . . So, you found cartridge casings, spent casings in the vehicle?

A   Yes.

Q   What was significant about the location of the cartridge casings?

A   Specifically, cartridge casings located in this vehicle, it pertains to the way they are ejected from this weapon would be -- if I am driving, the only way I am going to get a casing under the driver seat or by the instrument panel, behind the steering wheel, would be, my body would have to be canted toward the driver side window and the weapon would have to be pointed up the driver side window to get that ejection port and that trajectory.

Q   Okay. Because one was on the dashboard?

A   One was on the instrument cluster, right behind the steering wheel, around where the speedometer, tachometer is. It was right there. One was under the driver seat, which could have hit the dashboard, fallen under feet. Depending on if the subject is shooting the weapon and moving the weapon, which could result as one being on the passenger-side floorboard, because it could eject, hit the windshield, the dashboard, or the floor board, which would put the round -- that's why a round would be on the passenger-side floor board.

Q   Would it be possible for a passenger to fire that gun out of the driver[s] side window?

A   If you look at the weapon again, it's not a shoulder stock. It has a very short barrel length. That is a very loud and high-powered rifle. When a gun is shot at close distance from the muzzle, whether the barrel is long or short, you're gonna [sic] get -- gun powder still comes out, and it will singe clothing, if it's close, or skin, if the skin is close to the end of the barrel. The night of the incident, with Mr. Andrews, he was asked if he was injured in any way, shape, or form, which is part of our policy of our department. He described no injuries. He didn't observe to have any injuries; any powder burns or anything like that on his face or body that would be in relation to that gun being fired close to him, and without a muzzle-break device on that rifle, and the shortness of the barrel, if it was fired from the passenger side of the vehicle, somebody reaching over towards the driver's side, he would have suffered significant hearing damage, as

well as, temporarily blinded by the flash that the muzzle caused. At night, there is a flame that's going to come out of that weapon when it's fired. I mean, there will be a flame even in the daytime, but, at nighttime, you'll be able to see it, obviously, more visible.

According to Lieutenant Dean, the AK-47 rifle found in the vehicle was not reported as stolen.

## ON THE MERITS:

## ASSIGNMENT OF ERROR NUMBER ONE

Defendant argues that the evidence presented at trial, when viewed in the light most favorable to the prosecution, was insufficient to find him guilty of attempted first degree murder beyond a reasonable doubt.

### *Standard of Review*

The analysis for insufficient-evidence claims is well settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The testimony of a single witness, if believed, and absent internal contradictions or irreconcilable conflicts with physical evidence, is sufficient to support a conviction. *State v. Pierre*, 14-1071 (La.App. 3 Cir. 5/6/15), 170 So.3d 348, *writ denied,* 15-1151 (La. 5/13/16), 191 So.3d 1054.

This court has stated the following regarding appellate review in cases relying on circumstantial evidence:

> When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir. 1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams*, 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

*State v. Baumberger*, 15-1056, pp. 10–11 (La.App. 3 Cir. 6/1/16), 200 So.3d 817, 826–27, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859, *cert. denied*, 583 U.S. 950, 138 S.Ct. 392 (2017).

*Attempted First Degree Murder*

In the instant case, Defendant was convicted of attempted first degree murder. First degree murder is defined as the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of assault by drive-by shooting. La.R.S. 14:30(A)(1). An assault by drive-by shooting is an assault committed with a firearm when an offender uses a motor vehicle to facilitate the assault. La.R.S. 14:37.1(A). An attempted first degree murder requires the offender do or omit to do an act for the purpose of and tending directly toward the accomplishing of his object and have the specific intent to kill. La.R.S. 14:27(A).

To support a conviction for attempted murder, only specific intent to kill is sufficient. *State v. Hongo*, 96-2060, p. 2 (La. 12/2/97), 706 So.2d 419, 420. Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La.R.S. 14:10(1). Specific intent need not be proven as a fact but may be inferred by the circumstances of the transaction and actions of the defendant. *State v. Graham*, 420 So.2d 1126 (La.1982). The simple act of pointing a gun at the victim's vehicle and firing numerous shots at the occupants in the vehicle shows specific intent to kill. *State v. Bethley*, 12-853, p. 7 (La.App. 3 Cir. 2/6/13), 107 So.3d 841, 847.

### *Arguments in Brief*

In his brief, Defendant contends that no rational trier of fact could have found him guilty of attempted first degree murder beyond a reasonable doubt. According to Defendant, none of the occupants in the vehicle could identify the shooter or definitively state whether there was more than one person in the vehicle that they believed shot at them. Defendant further asserts he did not stop until he was in St. John the Baptist Parish, which was over 100 miles away from the scene. Although he admits he called 911 to report that he had been shot at and returned fire, Defendant claims he never stated that the shooting occurred on I-10. Defendant also contends that although a firearm and spent casings were discovered in his vehicle, there was no evidence presented at trial that proved the casings were a match to the bullet holes found in the victims' vehicle.

Defendant further argues the suppressor and spent casings recovered from his vehicle were not a match to the weapon found in his possession. According to Defendant, no gunshot residue test was conducted to reveal whether he fired a weapon on the night of the incident, and no gunshot powder burns were noticed on

16

Defendant. Defendant also claims the authorities never attempted to locate Tyler Myers. As such, Defendant contends the State failed to meet its burden of proving he was guilty of attempted first degree murder beyond a reasonable doubt.

On the contrary, the State argues that there was sufficient evidence presented to determine that a crime occurred, and Defendant committed the offense. According to the State, the evidence showed that the shots were fired at the victims and came from a black Kia Soul that was driving over 80 miles per hour on I-10 at 1:00 a.m. The State contends the only Kia Soul shown to have passed on the interstate at that time and near the scene of the shooting was rented by Defendant.

The State further contends the evidence presented established that there was no opportunity for another vehicle to either enter or exit the interstate between the location of the shooting and the LPR camera. The State also asserts that Defendant called 911 and claimed that he had been involved in a shooting approximately an hour after the incident and about 100 miles down the interstate. The State also argues that several spent casings and an AK-47 "Draco style" pistol were found in Defendant's possession after a subsequent search of the rental. Moreover, the State contends there was a "direct line" between the dark colored Kia Soul seen by the victims, captured on the LPR system, and pulled over in St. John the Baptist Parish. The State claims Defendant was the only occupant in the vehicle and there was physical evidence presented that suggested that the AK-47 was fired out of the driver's side of the vehicle.

According to the State, it proved the identity of the shooter beyond a reasonable doubt, and given the evidence, a reasonable jury could conclude that the shots fired at the victims and their vehicle came from the black Kia Soul seen immediately prior to the shooting. Additionally, the State contends there was insufficient time for Defendant to swap drivers or passengers and still make it to

17

St. John the Baptist Parish in the given time frame. As such, the State argues that, when viewed in the light most favorable to the State, there was sufficient evidence presented to establish each element of attempted first degree murder and that Defendant's argument is without merit.

At the trial, Deputy Olander testified the impact marks found on the victims' vehicle were consistent with gunshots. Eddie Coreas, the driver of the vehicle, identified the car that passed his family on the interstate at the time of the shooting as a "dark Kia Soul." While searching the LPR System, Detective Charles Scott spotted a black Kia Soul driving past mile marker 113.5 at 1:11 a.m., minutes after the shooting, which placed the black Kia Soul at the scene. According to Detective Scott, there were no exit or entrance ramps between mile markers 112 and 113.5 where the shooting occurred, so there was no opportunity for another vehicle to be involved in the shooting. Detective Scott also recognized the same black Kia Soul on the LPR system traveling north on "US 90, Evangeline Throughway, near the Lafayette airport" in the direction of I-10 at 12:57 a.m. Detective Scott stated depending on the rate of speed the Kia Soul was traveling it would have been able to drive from Evangeline Throughway to I-10 near mile marker 113.5 within the fourteen-minute time frame.

Although Defendant argues the State failed to prove he was the shooter, Detective Lagrange testified that Defendant, himself, made a 911 call at 2:17 a.m., which was approximately an hour from the scene, while in St. James Parish reporting his involvement in a shooting. Considering the time between this shooting and Defendant's arrival in St. John the Baptist Parish, we find that there was insufficient time for Defendant to drop off an alleged passenger. Moreover,

Lieutenant Dean stopped the same black Kia Soul in St. John the Baptist Parish with Defendant as the driver and in possession of an AK-47 "Draco style" firearm.

Thus, it was reasonable for the jury to believe that Defendant, who was the driver of the Kia Soul, was the shooter even though none of the occupants in the victims' vehicle were able to identify the shooter. Additionally, it was reasonable for the jury to conclude the bullet holes came from the weapon found in Defendant's possession. Thus, this court finds that a rational trier of fact could have found Defendant guilty of attempted first degree murder beyond a reasonable doubt.

Therefore, we find, when viewed in a light most favorable to the prosecution, the evidence adduced at trial was sufficient to prove Defendant committed five counts of attempted first degree murder, and this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER TWO

In Defendant's second assignment of error, he asserts the trial court's comments, remarks, and interruptions violated his constitutional right to a fair trial and that of ineffective assistance of counsel.

### *Standard of Review*

During a jury trial, the judge has a duty to remain neutral and impartial, while administering the law through rulings on evidence and charging the jury as to the applicable law. *State v. Baldwin,* 388 So.2d 679, 686–87 (La.1980). "A judge is more than a moderator; he is charged to see that the law is properly administered, and it is a duty which he cannot discharge by remaining inert." *United States v. Marzano,* 149 F.2d 923, 925 (2nd Cir.1945); *see also Baldwin,* 388 So.2d at 686–87. In the discharge of his duties, the judge shall not comment upon the facts of the case in the presence of the jury, either by commenting on evidence or testimony or by giving an opinion as to what has been presented, proved, or not proved. La.C.Cr.P. art. 772.

If, during trial, a defendant believes that the trial court commented improperly on the evidence or made prejudicial comments in the presence of the jury, then defendant should object at the time of the

occurrence or move for a mistrial. *Baldwin,* 388 So.2d at 686; La.C.Cr.P. arts. 770, 775. A motion for mistrial or a contemporaneous objection to the alleged prejudicial comments or judicial bias preserves the issue for review on appeal. La.C.Cr.P. art. 841. *See State v. Ellwest Stereo Theatres, Inc.,* 412 So.2d 594, 597 (La.1982).

We review claims of prejudicial comments or bias under a harmless error analysis.

> Harmless-error review looks . . . to the basis on which "the jury *actually rested* its verdict." *Yates v. Evatt,* 500 U.S. 391, 404, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991) (emphasis added). The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.

> *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). In order to constitute reversible error, the judge's improper comments must be such as to have influenced the jury and contributed to the verdict, thereby denying the defendant a fair trial. *State v. Johnson,* 438 So.2d 1091, 1102 (La.1983).

*State v. Diggins*, 12-15, pp. 13–14 (La.App. 4 Cir. 10/23/13), 126 So.3d 770, 784, *writ denied*, 13-2742 (La. 5/23/14), 140 So.3d 723.

A. *Trial Court's Comments:*

As to the issue of the trial court's comments during voir dire, and the trial, we note that defense counsel failed to object to these statements. Thus, Defendant is precluded from asserting any claims regarding the trial court's statements on appeal. La.Code Crim.P. art. 841; *State v. Young*, 344 So.2d 983 (La.1977).

B. *Jury Instructions*

During deliberations, the jury requested clarification on the charges against Defendant. Thereafter, the following colloquy occurred (emphasis added):

> THE COURT: **Okay, we got a note that the jury wants me to tell them the differences between the different charges. So, we start out with attempted first-degree murder. First-degree murder is the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm and is engaged in the perpetration or attempted perpetration of assault by drive by shooting**.

20

MS. BROUSSARD [defense counsel]: May we approach, Your Honor?

MR. SONGY [prosecutor]: Approach, Your Honor?
(SIDEBAR)

MS. ROSE [defense counsel]: I think you're reading from the old paper.

MS. LOUVIERE [prosecutor]: We had to strike the great bodily harm part.

MR. SONGY: We struck the great bodily harm.

MS. ROSE: Right.

(COUNSEL RETURN TO SEATS)

THE COURT: So, let me start over. First-degree murder is the killing of a human being, when the offender has the specific intent to kill and is engaged in the perpetration, or attempted perpetration of assault by drive-by shooting. So, there is [sic] two elements. Not only the intent to kill or inflict great bodily harm, but, it has to be engaged in the perpetration, or attempted perpetration, of assault by drive-by shooting. Assault by drive-by shooting is an assault committed with a firearm; when the offender uses a motor vehicle to facilitate the assault. The term drive-by shooting means the discharge of a firearm from a motor vehicle on a public street or highway, with the intent either to kill, cause harm to, or frighten another person. Assault is an attempt to commit a battery or the intentional placing of another human being in reasonable apprehension of receiving a battery. A battery is the use of force or violence on the person of another. An assault is an attempt to commit a battery. **So, the bullet didn't hit anybody and didn't kill anybody. One young man got hit by a shard of glass.**

MS. BROUSSARD: Objection. Approach?

MS. LOUVIERE: Your Honor, may we approach?

THE COURT: **You may make an objection after I'm finished explaining everything. That's not what this man is charged with.** He is charged, basically, with attempted first-degree murder by assault by drive-by shooting.

. . . .

THE COURT: All right. That's it.

MS. BROUSSARD: Judge, may we put our objection on the record?

21

THE COURT: Okay. I'm sorry. Go ahead.

MS. BROUSSARD: What we were objecting to was, Judge, during the reading of the jury instructions, there were times where you were commenting on the actual evidence, and we just wanted that to be clear that would be persuasive to the jury that you were making a belief, one way or another. That's what we were objecting to, Your Honor.

THE COURT: Well, we must have a total different recollection of what I said, but, the transcript will show. What I was trying to do is explain the context in which the charges are being given; not making any comment, whatsoever, on the weight or sufficiency of the evidence, but, simply what the elements of the particular crimes were.

MS. BROUSSARD: Yes, sir. We understand. We just wanted to make sure that we didn't give the jury any inferences. And, just note our objection for the record. Thank you.

THE COURT: Well, I don't know if anyone else is, but, I'm convinced I didn't give the jury any inferences as to what they should do. All right. Thank you.

MR. BROUSSARD: Thank you, Your Honor.

Defendant now argues that the trial court's statement was a "comment or opinion as to what has been proved or not proved, and such a statement is prohibited by La.Code Crim.P. art. 772 and 806." The judge in the presence of the jury shall not comment upon the facts of the case or charge the jury concerning the facts of the case "either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted." La.Code Crim.P. arts. 772, 806.

In *State v. Gallow*, 338 So.2d 920 (La.1976), the defendant argued that the trial court committed legal error by commenting on the facts of the case and expressing an opinion on his guilt or innocence during voir dire. Due to issues with the transcript, there were two versions of the trial court's statements. One version showed that the trial court stated, "There is no attempt involved here. He is on trial for the person who died . . . killed, not for the one he didn't get." The other version

22

showed that the trial court stated, "There is no attempt involved here. He is on trial for the person who got killed not for the one who didn't get killed." *Id.* at 922.

> On review, the Louisiana Supreme Court stated:
>
> Having reviewed the judges comment in context, we construe it to mean that the defendant was charged with murder, not attempted murder. (The defendant was charged with second degree murder of Bobby Miller, who was struck by a bullet intended for another.)
> Even if the comment were construed to be a factual comment, however, in our opinion the error would not be reversible. Firstly, the comment by the court during voir dire is not a comment on the facts within the purview of Article 772 of the Louisiana Code of Criminal Procedure. Secondly, the remark did not relate either directly or indirectly to any of the grounds listed in Article 770 of the Louisiana Code of Criminal Procedure requiring a mistrial if requested. At most, the comment would constitute a remark under Article 771 of the Louisiana Code of Criminal Procedure, which can be cured by an admonition. Such an admonition was given.
>
> It is well settled that a verdict will not be set aside because of improper remarks by the judge unless the reviewing court is thoroughly convinced that the jury was influenced by the remarks and that they contributed to the verdict. *State v. Hammler*, La., 312 So.2d 306 (1975); *State v. Simpson*, 247 La. 883, 175 So.2d 255 (1965).

*Id.* at 922.

Considering *Gallow*, we cannot say that the trial court's comments were improper, we find that the trial court was simply stating that Defendant was charged with attempted murder, not murder. Moreover, and contrary to La.Code Crim.P. arts. 772 and 806, we find the trial court's comments were not on the facts of the case, nor that the trial court's comments influenced the jury. Therefore, Defendant's argument is without merit.

*Admission of Evidence*

Defendant additionally claims the trial court admitted evidence without allowing defense counsel to object, as to the following colloquy (emphasis added):

> THE COURT: Let the record show that the exhibit is being published to the jury without objection.
>
> MS. BROUSSARD: No objection, Your Honor.

MS. LOUVIERE:

Q      Ms. Lagrange, you also collected pictures, which would have been taken by another deputy, or one of the initial deputies?

A      Yes.

Q      You reviewed those photographs?

A      Yes.

MS. LOUVIERE: May I approach?

THE COURT: Yes.

MS. LOUVIERE: Your Honor, we'd like the record to reflect that the State's going to approach with State's Exhibit 9, for identification purposes only.

MS. BROUSSARD: Your Honor, we would have to object to it because these are not pictures that Ms. Lagrange actually took.

THE COURT: **Well, you could ask her some questions as to how she came into possession of them and see if she recognizes them.**

MS. LOUVIERE:

Q      Can you identify the documents that I've just given to you?

A      Yes.

Q      What are those documents?

A      Those are photographs that were taken by the initial deputy of the vehicle on the side of Interstate 10.

Q      Which vehicle?

A      The victim's vehicle.

Q      You recognize that to be the victim's vehicle?

A      Yes, ma'am.

Q      Do those pictures accurately depict the same vehicle that you took photographs of?

A      Yes, ma'am.

24

Q     It's just a different kind of view, or a total view of the vehicle?

A     Yes, ma'am.

Q     You know it to be the victim's vehicle?

A     Yes, ma'am.

MS. LOUVIERE: Your Honor, the State would move to offer, file, and introduce what's been marked State's Exhibit 9, in globo.

MS. BROUSSARD: We would object, again. I think that these are pictures that was [sic] taken by another officer, who I think is present, who could have identified these pictures.

THE COURT: **He still could. So, I will overrule the objection.**

MS. LOUVIERE: Thank you, Your Honor.

Defendant further argues the trial court was biased towards the State by assisting the State with its introduction of photographic evidence.

In *State v. Pearson*, 07-332 (La.App. 5 Cir. 12/27/07), 975 So.2d 646, the defendant argued that the trial court erred by admitting photographic evidence without proper authentication. In that case, the State introduced the evidence during one of the responding officer's testimony. The defendant subsequently objected to the introduction of the photos because the testifying officer did not take the photos. The trial court overruled the defendant's objection and allowed the State to introduce the photos into evidence. On appeal, the fifth circuit stated:

> Generally, photographs are admissible if they illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place, or thing depicted. *State v. Becnel,* 04–1266, p. 16 (La.App. 5 Cir. 5/31/05), 904 So.2d 838, 851. The proper foundation for the admission of a photograph into evidence is laid when a witness having personal knowledge of the subject depicted by the photograph identifies it as such. *Id.* It is well settled that a photograph need not be identified by the person who took it to be admissible. *Id.*
>
> Officer Kowalski identified the photographs as taken of the shopping basket and cart defendants were pushing in the store at the time of the incident. The photographs clearly shed light on the described looted items. Thus, the photographs were properly admitted.

25

*Id.* at 655.

Here, the State introduced the photographic evidence by asking Detective Lagrange if she recognized the vehicle in question, just as in *Pearson*. Although the trial court may have suggested that the State ask Detective Lagrange how she came into possession of the photos, we note Detective Lagrange's testimony as to her knowledge of the vehicle in the photos was enough to make the photos admissible. Moreover, we note defense counsel did not object based on any alleged bias by the trial court, and a new ground for an objection cannot be presented for the first time on appeal. *State v. Cressy*, 440 So.2d 141 (La.1983). Thus, we find this argument by Defendant to be without merit.

## ASSIGNMENT OF ERROR NUMBER THREE

This assignment of error is based upon Defendant's *Batson* challenge. Defendant, who is an African American male, claims the trial court erred in denying his defense counsel's *Batson* challenge.[4] Specifically, Defendant contends the trial court's use of a "systematic exclusion" was the incorrect standard for a *Batson* analysis and that the State's reasons for peremptorily striking the prospective African American jurors were not race-neutral, plausible, or sufficient.

### *Standard of Review*

> In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, the United States Supreme Court held that the use of peremptory challenges to exclude persons from a jury based on their race violates the Equal Protection Clause. The jurisprudence regarding *Batson* is well-settled in Louisiana:
>
> > A defendant's *Batson* challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a

---

[4]*Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986).

comprehensive reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

*Alex v. Rayne Concrete Serv.*, 05-1457, 05-2344, 05-2520, p. 15 (La. 1/26/07), 951 So.2d 138, 150-51 (quoting *State v. Snyder*, 98-1078 (La. 9/6/06), 942 So.2d 484).

In discussing the first *Batson* criterion, the United States Supreme Court has explained that "a prima facie case of discrimination can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.' " *Johnson v. California*, 545 U.S. 162, 169, 125 S.Ct. 2410, 2416, 162 L.Ed.2d 129 (2005) (footnote omitted) (quoting *Batson*, 476 U.S. at 96, 106 S.Ct. 1712). The court further explained:

"To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race."

*Id.* (quoting *Batson*, 476 U.S. at 96, 106 S.Ct. 1712). Therefore, "a defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson*, 545 U.S. at 170, 125 S.Ct. 2410.

*State v. Thomas*, 17-959, pp. 22–23 (La.App. 3 Cir. 9/26/18), 255 So.3d 1189, 1203–04, *writ denied*, 18-1757 (La. 4/22/19), 268 So.3d 294, *and writ denied*, 18-1662 (La. 4/22/19), 268 So.3d 303.

*Voir Dire*

During voir dire, defense counsel raised a *Batson* challenge after the State peremptorily struck three African American potential jurors, stating (emphasis added):

> MS. BROUSSARD [defense counsel]: Your Honor, we would [sic] make [sic] Batson Challenge because the State has stricken Ms. Aguillard, who is a black female, as well as, Mr. Catrell Noel, who is a black male, as well as, Goodie. I don't know his first name, James Goodie, who is also a black male. Since there has [sic] been three people, African-American, which our client is -- we think that it's at the point where we need to assert the Batson Challenge.
>
> MS. LOUVIERE [prosecutor]: Your Honor, the State will point out the record that on Panel A, the State accepted Janella Demouchet. She is a black female. The State also accepted Lambert Goodie who is a black male. On that panel, the State struck Sherry Poirier who was a white female. On Panel 2, the State accepted Ms. Mary Payne and Ms. Brittany Payne on that panel; those were both black females. Both of those left for cause, beyond the control of the State. But, the State did accept both of those individuals. Mr. Broussard was a black male. That was the State's second strike. He was a black male. So, that would be one white female. One black male. I'm sorry. He would be the third strike. Secondly, the State struck Mr. Frederick, who was a white male. Our third strike would have been Mr. Broussard, who is a black male. My fourth strike was Mr. Goodie. Black male. On the third panel, the State accepted Ms. Davis, who is a black female. Then, struck Mr. Noel, who is a black male. Our last strike was a white female.
>
> THE COURT: I hardly see a pattern for racial selection, based on those strikes. Perhaps when we finish the next panel, and if you still feel that it's a Batson violation, we might have a better cross-section to go from. But, right now, I don't see that there is a pattern. So, I don't have to go into [sic] analysis. I'll let you reserve your right to re-urge the Batson Challenge after we see the next panel.
>
> MS. BROUSSARD: I guess note our objection, and we would ask to be able to reserve our right to be able to assert it again.
>
> THE COURT: Yes, ma'am. So, we will revisit this issue once we complete jury selection, and before we release all the jurors, in case we do strike some of those that have been accepted.

Later, defense counsel re-urged her *Batson* challenge, stating:

> MS. BROUSSARD: . . . We would like to re-urge the Batson Challenge.
>
> THE COURT: Which juror was it?
>
> MS. BROUSSARD: Let me get my notes, Judge. Okay. Yes, Your Honor. So, in the first panel -- I'm sorry. In, Panel 2, there was a black male that the State struck, and he said he would hear both sides and that he would be fair. Ms. Payne, I think the Court released her with cause. Ms. Brittany Payne, I think was also released for cause, and both of them are black females. The State used State 3 to get rid of Mr. Daymon Broussard. Also, they got rid of Mr. Catrell Noel. He was a black male[,] and he stated that he would be fair and impartial. That was State's -- I think that's 5. They also struck Ms. Aguillard, and she did have issues in saying that she would have to monitor her blood pressure, but, the Court said they would make accommodations in regards to that. And, the State used State's 6 to strike her. **The State has used eight strikes, and of the eight, they have stricken at least four black people. And, we believe that is a significant amount, especially since there is [sic] not a lot of black people that are present for our jury. And, I can understand that there were some people that were stricken for cause, however, Mr. Andrews is a black male and he is entitled to have a jury of his peers. So, we would ask for those reasons that a Batson Challenge would be valid.**
>
> THE COURT: All right.
>
> MS. LOUVIERE: Your Honor, again, I would state that in Panel 1, the State exercised [its] first strike, which was a white female. It exercised [its] second strike on Panel 2, which was a white male. In Panel 1, we accepted -- the State accepted the black female, Ms. Janella Demouchet. We also accepted a black male, Mr. Lambert Goodie. Mr. Broussard, the State's third strike. He was a black male, Your Honor. The State's fourth strike was Mr. Goodie, who was a black male. The State's fifth strike was a black male.
>
> THE COURT: What's the name of that person?
>
> MS. LOUVIERE: That was Catrell Noel. State's 6 was a black female. State's 7 was a white female. State's 8 was a white female. We would also point out that in Panel 2 -- well, so in Panel 1, we had accepted a black female and a black male. In Panel 2, we accepted both Mary Payne and Brittany Payne. Mary Payne got cause after the State indicated that we wanted to accept. If I remember correctly, Brittany Payne was actually accepted as a juror, and was accepted by both parties. It was a black female who was on the jury, and then got excused because she gave some reasons to the Court that would make it incapable for her to remain as a juror, but she was initially seated as

29

our sixth juror, I believe it was, because we accepted her. We also accepted Sophia Davis who is a black female, and Byron Chretien who is a black male. I would also think that we could make a reverse argument -- we could make a reverse Batson Challenge because two of the fourteen were the non-white individuals; one was a black female[,] and one was a Hispanic male. All the other jurors that the Defense rejected were all white individuals.

MS. ROSE [defense counsel]: Your Honor, if we can make a clarification, and this is just on the law in the state. The law of Batson. The Defense has the burden of proving -- or the State, in her cross-Batson Challenge has the burden of proving that the other party had stricken these particular jurors because of their race. Once we articulate that, the other side, in this case, the State, has the burden of proving that they did not strike these particular jurors because of race. What the State is arguing -- just displayed to us is who they chose; the other jurors. But, she did not argue a race-neutral reason why they struck those particular jurors. And, that's just the law part of it.

MS. LOUVIERE: My understanding of the law is that, once they make the challenge, the Court has to rule that there is a systematic exclusion. And, if the Court doesn't find there is systematic -- if the Court finds that we systemically excluded, based upon race, then, it's incumbent upon the State to respond and give race-neutral reasons significant for that, so I believe we hadn't gotten to the point of systematic exclusion. Once that happens, then the State -- or if that happens, the State would be more than happy to provide race-neutral reasons. I just think it's premature.

THE COURT: Who are the African-American people who you claimed were systematically excluded? Go over those again with me. I heard Broussard and Goodie were excused.

MS. BROUSSARD: The ones that were State struck were Mr. Daymon Broussard, which was their strike three. He was a black male. Mr. Chance Goodie. I think it's Chance Goodie that was strike four, that was also a black male. And, Mr. Catrell Noel. That was the State's 5. That was [a] black male. And, Ms. Aguillard was State's 6, which was a black female. And, they testified that they could be fair and impartial. There are other black people[,] and I understand that the State is saying that they accepted them, but those people are not sitting on the jury because of cause. So, I think that although they did, the fact of the matter is Mr. Andrews' jury is not made up of those people. So, I understand the State accepted them, but, those people are not on the jury. So, at this particular point I think we need to focus on the people that are on the jury, and give reasons as to why the people that were stricken for whatever reason, they should have to state a race-neutral reason as to that.

THE COURT: Well, the first step you have to determine is whether or not there has been a systematic exclusion. After finding a systematic exclusion, then, we go into race-neutral reasons. But, if there is no systematic exclusion, then the State doesn't have to articulate any particular or specific reasons. **So, my finding is there is [sic] no systematic exclusions.**

Thereafter, the trial court allowed the State to offer race-neutral reasons for striking each prospective African American juror, wherein the following colloquy occurred:

MS. LOUVIERE [prosecutor]: Okay, Your Honor. Let's see, the first juror was Mr. Broussard. Mr. Broussard, if I recall, he was sitting all the way on the end. He said things like he doesn't like dealing with criminal stuff. He'd rather not be here. Several times, he indicated his reluctance to be here on both sides, of even participating in the criminal process at all.

THE COURT: That's definitely my recollection. Mr. Broussard simply wanted out, so, I granted his wish and excluded him.

MS. LOUVIERE: And, Your Honor, I think that Mr. Latiolais, who sat next to him, although he didn't argue or put cause on Mr. Broussard, Mr. Latiolais, who sat next to him said the exact same things as Mr. Broussard, and he was excused for cause because it was moved for by the Defense. So, I mean, we challenged him on the same basis that they moved for cause on the very next juror, who was a white juror. That would be my race-neutral reasoning.

THE COURT: It was a problematic juror -- problematic jurors who were white.

MS. LOUVIERE: We didn't try to exercise a cause, I just struck him. The next juror would have been, is it Goodie? So, Mr. Goodie was the individual that sat at the bottom. I believe I asked Mr. Goodie if her [sic] was related to the other Mr. Goodie, who was currently our juror. I had some reservations about them being related. Sometimes, you know, two people who are related who are on the same jury tend to follow each other, and not act independently. He did, however, I will say for the record, say that he didn't believe that he was related to Mr. Lambert. Also, when questioning him, he seemed -- he had an issue. He was quick to say that he would dis-credit law enforcement officers, and didn't hold a lot of stock in what law enforcement said. He didn't seem to be overly law-enforcement-friendly. He verbalized his thoughts about his, you know, like I said, being quick to disagree with law enforcement officer and not really what they had to say. Obviously, the State felt like that would make him not the best juror for less than a case like this. I'm here to present law enforcement witnesses.

31

THE COURT: Certainly, we don't expect jurors to be pro-law enforcement. And we don't expect them to be anti-law enforcement, either. So, we do excuse those that have close ties to law enforcement, and articulate to the court that they do have a problem ruling against law enforcement. And, none of the jurors that were actually accepted expressed that concern to the Court; that they would have a problem not believing, or everyone admitted that they would commit to treating law enforcement officers the same as they would any other witness. That was done repeatedly. So, I would agree that there were no race-neutral excuses for Mr. Goodie. He seemed like he had a pretty bad attitude during voir dire, as well, for both sides.

MS. BROUSSARD [defense counsel]: I didn't get that from him. I thought he was very attentive.

MS. ROSE [defense counsel]: I thought so, too. I thought he was very --

MS. BROUSSARD: I thought he was very, very pleasant. I thought that he said he would be fair. He would be impartial. I didn't really get any of that when --

MS. LOUVIERE: He just expressed his -- he would seem to be zealous to –

THE COURT: One at a time, please. First, Ms. Louviere. Go ahead and speak and then, without interrupting her, listen to everything she says. Then, the Defense will be able to speak without interruption, so that I can hear both sides.

MS. LOUVIERE: I'm not saying that he wasn't engaged, but he was quick to exclude several --
. . . .

MS. LOUVIERE: So, Judge, there was a question that was asked. Would you hold law enforcement at a higher regard? The manner in the way that he answered was, hell no. Just to us, it indicated that he might have some issues with law enforcement, Your Honor. And, that's my race-neutral reason. That was what he said, and the manner in which he answered it.

THE COURT: Okay. Response?

MS. BROUSSARD: Your Honor, I remember that question. I don't remember him having that response. I thought he answered the question like everybody else. I thought he was -- I didn't get that response from him. I didn't think he gave any insinuating or non-verbal clues that would leave a person to believe that he was saying, hell no.

32

THE COURT: Well, I seem to remember him saying, hell no. The court reporter can tell me whether he did or not. You would need to give her time to examine the transcript. It might take a while. So, I am going to temporarily deny that challenge. But, if the transcript says hell no, then, I will.

Later, the trial court finished hearing the State's race-neutral reasons for striking the prospective African American jurors:

THE COURT: We're now back to the Batson challenge.

MS. LOUVIERE [prosecutor]: Yes, Your Honor.

. . . .

MS. LOUVIERE: I think that leads us to the last one[,] who is Catrell Noel. Mr. Noel who was on Panel 3. I think -- I've conferred with Counsel at my table, we all agreed that he was -- although he answered all the questions right, he was much more open in body language and just his answers and his willingness to be forthcoming was a lot more expressive with the Defense counsel, as opposed to the State. We felt like he wasn't the juror that we wanted to sit on the panel.

THE COURT: That was Mr. Noel?

MS. LOUVIERE: That was Mr. Noel, Your Honor.

THE COURT: Okay.

MS. LOUVIERE: We felt like his body language was a lot more closed off with the State, as opposed to the Defense. As for the last one, Your Honor, Ms. Aguillard. She had some heart issues, as she indicated. She had asked to be released from the jury. She would have needed a break every four hours. It would have required a lot of time. It was really out of courtesy. But, you know, I had no problem with Ms. Aguillard, personally. She was elderly. We've been courteous to every other juror that had a health issue. I felt no reason not to be courteous to Ms. Aguillard.

THE COURT: Okay. I thought the Defense had agreed to release Ms. Aguillard.

MS. LOUVIERE: I don't think they did.

THE COURT: I don't --

MS. LOUVIERE: I think --

33

MS. BROUSSARD [defense counsel]: I don't remember if you did a cause, but it was stricken by the State, so, we wouldn't have had to strike.

MS. LOUVIERE: My understanding is that, from what I recall, is that we addressed the issue because of her medical issues. We tried to raise it, kind of like, as a cause to see if we could get if [sic] for cause. The Defense said, look -- that the Court had indicated we could be accommodating to her, so, I used one of my peremptory challenges, for no other reason than to be accommodating for her because she was gonna [sic] need breaks every four hours, and it was gonna [sic] be difficult for her to sit here. We've been accommodating to everybody else. There was no reason not to be accommodating to her.

THE COURT: I agree. I probably should have accommodated her, right at first, like I did with everybody else that said they might have a problem serving because we had plenty of jurors to pick from.

MS. LOUVIERE: Right.

THE COURT: And, that's the reason why we've been so liberal with the [sic] excusing people, just based on their word about having difficulties. So, I don't see any reason why this lady should be treated any differently than all the other people that got excused. This made the State use a strike because -- it was clear that it wasn't that she didn't want to serve. I think she was willing to serve, but she would have had some difficulties for sure.

MS. LOUVIERE: I agree.

THE COURT: Health reasons, or otherwise. Okay. What else do we have?

MS. BROUSSARD: If I may respond to both of those. For Mr. Noel, the State is arguing that he was a little bit more receptive to me. I think, a lot of that comes from that I asked questions that made him respond. Whereas, I felt that the State did a lot more of telling him, and he just had to nod. So, I think whenever a person is asking you, you tend to be a little bit more responsive. So, I think he was just more responsive because of me asking more questions. As far as Ms. Aguillard, I can understand she had some health issues, and some of the other people we did, but, this lady, her issue was something that could have been -- we could have made accommodations for her. Some of the other people with the health issues, there was [sic] no accommodations to be made. They needed to go to the doctor, or they had to have procedures done and stuff like that. So, I think she was different in that respect. And, that's why we felt that that particular issue, with her medical issue, was not that big of a hurdle, and it was something that the Court could manage and help her to make sure that she would be able to take her medicine in a timely fashion, which of course they would.

THE COURT: I partially agree and partially disagree. Ms. Aguillard was not elderly. I did want to try to keep her on the jury at first, but, I could tell that she was having some difficulty as it, was and with a case of this magnitude, attempted murder by drive-by shooting, I sincerely felt that this might be a little too much for her and decided to release her, as I did many other people who expressed problems with medically serving. So, I don't think the release of Ms. Aguillard was in any way related to her race, but, rather to her health condition.

MS. LOUVIERE: And, Your Honor, just as an extra note. I believe she said she had just gotten her diagnosis the day before and because of that, she was having to monitor her blood pressure every four hours and there were different things that she had to do for a period of time, based on the most recent diagnosis. So, I think that she had a lot of maintenance that was going on, specifically at this time as opposed to some other time. It's the next two weeks, I believe it was that she had some things to do to make sure that she was doing it right, or if her medication was working correctly or whatever it is that they wanted to monitor her for.

THE COURT: I agree. The only mistake, if you can call it a mistake, is that I didn't release her right away. I made her sit around more, before I finally came to the conclusion that she should [be] released based on health reasons.

MS. BROUSSARD: Just for the record, Your Honor, I would like for it to be stated that she was stricken. She wasn't a cause challenge.

THE COURT: I understand.

MS. BROUSSARD: For record purposes.

THE COURT: Do we have any more?

MS. BROUSSARD: No, Your Honor. I think those were the ones that we were making a note of. And, just for clarification, out of the eight strikes that the State used, four of them were black people.

THE COURT: The State have anything more they want to present?

MS. LOUVIERE: Your Honor, we had lodged a reverse Batson, but, I don't think -- I mean, we're not concerned about moving forward.

THE COURT: So, we had asked that the court reporter look something up about a man who might have made a comment.

COURT REPORTER: It's Mr. Goodie.

35

Subsequently, the trial court ruled on the defense's *Batson* challenge stating (emphasis added):

> THE COURT: I can make the ruling now and deny the objection. Whatever was said doesn't change the fact **that there was no intentional discrimination, based on race. That's the bottom line. Jurors are excused for the reasons that are race-neutral.**

### *Standard for a Batson Challenge*

Defendant first argues the trial court erred by using the "systematic exclusion" standard when ruling on defense counsel's *Batson* challenge. To support his argument, Defendant cites to *State v. Hampton*, 52,403, p. 27 (La.App. 2 Cir. 11/14/18), 261 So.3d 993, 1012, *writ denied*, 19-287 (La. 4/29/19), 268 So.3d 1029, wherein the second circuit held that the "systematic exclusion" standard was the improper standard of review for a *Batson* analysis. Hence, we find Defendant is correct in his assertion that the trial court used the incorrect standard when ruling on defense counsel's *Batson* challenge. However, the record establishes the trial court allowed and the State offered race-neutral reasons for striking the prospective African American jurors, thus we find Defendant's argument has become moot. Specifically, under *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 1866 (1991), the Supreme Court noted, "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."

Therefore, since the trial court allowed and the State provided race-neutral reasons for striking the prospective African American jurors, and considering the ruling in *Hernandez,* we find that Defendant's argument regarding the trial court's

36

use of the incorrect standard in its review of defense counsel's *Batson* challenge is misguided and moot.

<u>*Trial Court's Ruling on Defense Counsel's Batson Challenges*</u>

Defendant next argues the trial court erred by finding that the State's reasons for challenging Daymon Broussard, James Goodie, Catrell Noel, and Amelia Aguillard were plausible, sufficient, and race neutral. Defendant contends Mr. Broussard was willing to apply the law and give him a fair trial, even though the State argued that he was reluctant to be a juror. Defendant claims Mr. Goodie did not respond "hell no" when asked if he would hold law enforcement to a higher standard, although the State argued otherwise. Defendant argues defense counsel asked Mr. Noel questions that required a response, which made it seem as though he was more responsive to the defense. Defendant contends the trial court could have accommodated Ms. Aguillard's health issues. Thus, Defendant claims that the State's reasons for challenging each prospective African American juror were not race-neutral.

We note Defendant's argument concerns step two of the *Batson* analysis, which requires a determination of whether the State presented race-neutral explanations for challenging each prospective juror. Thus, we will review each prospective juror pursuant thereto.

1. *Daymon Broussard*

The State asked the prospective jurors if they were okay with sitting as jurors in a trial wherein the crime was serious. According to the record, the State said, "I see Mr. Broussard, you are saying no"; thereafter, Mr. Broussard indicated that "it would be tough" for him to do so. Defense counsel later questioned Mr. Broussard about his hesitance to be a juror on the case, and Mr. Broussard responded, "I mean, I don't like, really know, like, to deal with all with all of this. Like, I don't

know nothing [sic] like, for this." Mr. Broussard also revealed that he did not want to be involved in the criminal justice system. The trial court then asked the prospective jurors if they would be able to "hear the evidence, hear the law, and determine whether or not the State has proven beyond a reasonable doubt the elements of the crime." When the trial court specifically asked Mr. Broussard if he would be able to do so, he stated, "I guess." When offering race-neutral reasons for striking Broussard, the State claimed that he was reluctant to participate as a juror and that he simply wanted out. The trial court ultimately agreed, stating: "That's definitely my recollection. Mr. Broussard simply wanted out, so, I granted his wish and excluded him."

2. *James Goodie*

Defense counsel asked the prospective jurors if they would hold law enforcement to a higher standard than someone else. According to the record, there was no audible response from Mr. Goodie. Yet, when the State provided its race-neutral reasons for striking Mr. Goodie, the State claimed that Mr. Goodie responded, "hell no," and that Mr. Goodie was not law enforcement friendly. The trial court subsequently agreed with the State's recollection of Mr. Goodie's response and noted that Mr. Goodie had a "pretty bad attitude during voir dire".

3. *Catrell Noel*

Catrell Noel answered all questions asked of him by the State and defense counsel. Nevertheless, when the State provided its race-neutral reasons for striking Mr. Noel, the State indicated that "he was much more open in body language and just his answers and his willingness to be forthcoming was a lot more expressive with the Defense counsel, as opposed to the State" and that he was not the type of juror that it wanted to sit on the panel.

*4. Amelia Aguillard*

Amelia Aguillard informed the court that she was on medication for her heart and that she would need to check her blood pressure every four hours. When offering a race-neutral reason for striking Ms. Aguillard, the State asserted that it had struck her "out of courtesy." The trial court subsequently agreed, stating "I probably should have accommodated her, right at first, like I did with everybody else that said they might have a problem serving because we had plenty of jurors to pick from."

*Analysis*

Louisiana courts have recognized a plethora of race-neutral explanations for challenging prospective jurors. In *State v. Jacobs*, 09-1304 (La. 4/5/10), 32 So.3d 227, *reh'g granted in part on other grounds*, 09-1304 (La. 6/18/10), 37 So.3d 994, the State peremptorily challenged a prospective juror due to his medical issues after defense counsel declined to jointly challenge the juror for cause. The Louisiana Supreme Court held the State's explanation for challenging the potential juror was race neutral. *Id*. at 231. In *State v. Parker*, 04-1017 (La.App. 5 Cir. 3/29/05), 901 So.2d 513, *writ denied*, 05-1451 (La. 1/13/06), 920 So.2d 235, the State challenged a prospective juror after she was more receptive to the defense. The fifth circuit stated, "perceived hostility, lack of interest and unresponsiveness are race-neutral reasons for excluding potential jurors. *State v. Duplessy*, 03-185 (La.App. 5 Cir. 7/29/03), 853 So.2d 77, 82, *writ denied*, 03-2416 (La. 2/6/04), 865 So.2d 739." *Id*. at 523.

After reviewing the reasons offered by the State for each of the potential African American jurors peremptorily struck, we find the trial court did not err in finding that the reasons provided by the State were race-neutral and there was no

intentional discrimination. Accordingly, we find Defendant's assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER FOUR

Defendant contends the trial court erred in imposing constitutionally excessive sentences and failing to sufficiently consider La.Code Crim.P. art. 894.1. Specifically, Defendant argues the trial court failed to consider Defendant's mitigating circumstances, such as his age, lack of criminal history, dependents, employment, or health.

In response, the State argues that Defendant's sentences are not excessive. Moreover, the State asserts Defendant should be limited to a claim of bare excessiveness since he failed to file a motion for reconsideration of sentence. We note after the trial court sentenced Defendant, defense counsel made a general objection. However, as noted by the State, no motion to reconsider was filed.

In *State v. Barling*, 00-1241, pp. 10–11 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1041–42, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331, this court addressed review of a sentence following a general objection and the failure to file a motion for reconsideration:

> The failure to timely file a written motion to reconsider sentence or to orally urge any specific ground for reconsideration at sentencing precludes a defendant from objecting to the sentence imposed. *State v. Moore*, 98–1423 (La.App. 3 Cir. 3/3/99); 734 So.2d 706. *See also State v. King*, 95–344 (La.App. 3 Cir. 10/4/95); 663 So.2d 307, *writ denied*, 95–2664 (La.3/15/96); 669 So.2d 433. La.Code Crim.P. art. 881.1 (emphasis added) serves as the basis for this restriction and provides, in pertinent part:
>
> A. (1) Within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.
>
> (2) The motion shall be oral at the time of sentencing or in writing thereafter *and shall set forth the specific grounds on which the motion is based*.

. . . .

D. Failure to make or file a motion to reconsider sentence *or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review*.

In cases where courts have held that an oral objection alone is sufficient to preserve the issue for review, the oral objection contained the basis for the motion, such as excessiveness of sentence. *See State v. Caldwell*, 620 So.2d 859 (La.1993); *State v. Trahan*, 98–1442 (La.App. 4 Cir. 12/1/99); 752 So.2d 921. Therefore, since Defendant's oral motion did not set forth any specific grounds to support his claim of excessive sentences, we are relegated to a bare claim of excessiveness. *State v. Mims*, 619 So.2d 1059 (La.1993), *after remand*, 626 So.2d 856 (La.App. 2 Cir.1993), *writ denied*, 93–2933 (La.2/11/94); 634 So.2d 373.

Since defense counsel entered a general objection, this court is relegated to a bare claim of excessiveness. Thus, Defendant waived review of his claims that the trial court failed to provide an adequate factual basis for the sentence imposed and failed to properly comply with La.Code Crim.P. art. 894.1.

However, in previous instances, this court has reviewed claims of excessiveness where no objection was made and no motion to reconsider sentence filed. *See State v. Johnlouis*, 09-235 (La.App. 3 Cir. 11/4/09), 22 So.3d 1150, *writ denied*, 10-97 (La. 6/25/10), 38 So.3d 336, *cert. denied*, 562 U.S. 1150, 131 S.Ct. 932 (2011); *State v. Thomas*, 08-1358 (La.App. 3 Cir. 5/6/09), 18 So.3d 127; *State v. Perry*, 08-1304 (La.App. 3 Cir. 5/6/09), 9 So.3d 342, *writ denied*, 09-1955 (La. 6/25/10), 38 So.3d 352; *State v. H.J.L.*, 08-823 (La.App. 3 Cir. 12/10/08), 999 So.2d 338, *writ denied sub nom. State ex rel. Lantz v. State*, 09-606 (La. 12/18/09), 23 So.3d 936; *State v. Quinn*, 09-1382 (La.App. 3 Cir. 5/12/10), 38 So.3d 1102, *writ denied*, 10-1355 (La. 1/7/11), 52 So.3d 885.

Thus, we will review Defendant's claim as a bare claim of excessiveness.

*Standard of Review*

La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99–192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00–0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95–2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*Barling* at 1042–43 (alteration in original).

In deciding whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, an appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes.
*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061.

Defendant was convicted of five counts of attempted first degree murder. Attempted first degree murder is enumerated as a crime of violence and carries a sentencing range of no more than fifty years but no less than ten years at hard labor. La.R.S. 14:2(B), 14:27(D)(1)(a), and 14:30.1.

In this case, the trial court sentenced Defendant to eighteen years at hard labor, which falls at the lower end of the sentencing range. Before imposing the sentences, the trial court stated its reasons as following:

THE COURT: In considering the sentencing in Mr. Andrews' matter, on an attempted first-degree murder, the possible sentence is imprisonment at hard labor for not less than ten years, nor more than fifty years, without the benefit of probation, parole, or suspension of sentence. Thereby, because of the charge Mr. Andrews would not be

eligible for any kind of probated sentence. In considering this sentence of imprisonment, the Court must determine whether there is a need for correctional treatment, or a custodial environment, that would provide a most effective place, during his commitment to an institution. I do consider his lack of criminal history, and this being his first offense. I do find that it is necessary for him to be sentenced to a substantial amount of time, in order for him to receive that correctional treatment. I think any lesser sentence would deprecate the seriousness of the crime. It's an attempted murder charge. We're not looking at an illegal discharge of a firearm. We're looking at a situation where the allegations that were proven at trial was that, when discharging that firearm multiple times into a vehicle with people, that he had the intent to commit great bodily injury or death of one of those people in the vehicle. I find that he would have known, or should have known, that the people in the vehicle were young in age, which increases the severity of this situation. It was a vehicle, including family that had juvenile children with them. In considering his sentence, I do consider the weapon that was used, and the level of violence that could be inflicted upon someone with the type of firearm that he used. I do find that he poses a threat to the community, and to the type of crime and the insinuation or allegation that the crime was committed upon someone, without any reason for committing that crime, that this could happen to anyone in society, which causes a concern for the community, that someone is discharging a firearm into vehicles, without any knowledge of who these people are. In considering any mitigating circumstances, I do consider that Mr. Andrews has no criminal history[,] and this offense would have been the first time he would have been in any kind of crime of violence. I do consider some of the stuff presented in his explanation, and the pre-sentence investigation, the circumstances he may have been involved in, prior to the alleged commission of the crime. I do consider the circumstance[s] that have occurred with Mr. Andrews that have resulted during his incarceration. Although, that is outside of -- necessarily in the scope of this case; that he has had to endure substantial loss with regards to his family, and his incarceration has not made him available to his family during this time period. I do find that incarceration would, and in mitigation of his sentence, I do find that, based on the information that he has provided to the Court, and his presentations during the pre-trial situations, and also during the trial, that he would be able to be rehabilitated, during that time of incarceration, with any programs that were available to him. So, I do consider that he is someone that, although the circumstances that took place, I do consider that during incarceration, he would be someone that would be able to be rehabilitated and returned to society. So, I do not think it's necessary for him to receive the full sentence that's available, as that would not allow him to rehabilitate and return to society, at an age that he could still become a productive citizen of society. I also considered the victim impact statements, where they did express some concern. And, this circumstance that fell upon them caused a lot of anxiety, and caused the situation they're in. However, they did show forgiveness towards Mr. Andrews, and showed that

43

they don't think his life should necessarily be thrown away. However, . . . he should receive a sentence more than the minimum because of the type of crime that was committed.

*Analysis*

Louisiana courts have laid out the following guidelines regarding excessive sentence review:

> Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). In *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331, a panel of this court discussed the review of excessive sentence claims, stating:
>
> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La. 6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).
>
> Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061, a panel of this court observed that:
>
>> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating

44

and mitigating circumstances presented by each case."
*State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, 958.

*State v. Soileau*, 13-770, pp. 4–5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002, 1005–06 (alteration in original), *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261.

Regarding the nature of the crime, Defendant was convicted of attempted first degree murder. First degree murder is defined as the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of assault by drive-by shooting. La.R.S. 14:30(A)(1). An attempted first degree murder requires the offender do or omit to do an act for the purpose of and tending directly toward the accomplishing of his object and have the specific intent to kill. La.R.S. 14:27(A). Attempted first degree murder is enumerated as a crime of violence and carries a sentencing range of no more than fifty years but not less than ten years at hard labor. La.R.S. 14:2(B), 14:27(D)(1)(a), and 14:30.1. Here, the trial court sentenced Defendant to eighteen years at hard labor, which falls at the lower end of the sentencing range.

In the instant case, the evidence presented at trial was that, when Defendant was discharging that firearm multiple times into a vehicle, that he had the intent to commit great bodily injury or death of one or more of those people in that vehicle. Additionally, it was a vehicle with a family, including juvenile children, while they were peacefully traveling on Interstate 10, which increases the severity of this situation.

As to the second factor, the nature and background of the offender, the trial court noted Defendant was a first-time offender. However, as the trial court noted, it is not only the type of crime but also that Defendant is discharging a firearm into vehicles, without any knowledge of who were these people, and that the crime was

45

committed upon someone, without any reason for committing that crime, which could have happened to anyone in society, which causes a concern for not only the victims but the community as well.

The third factor is a comparison of Defendant's sentence with the sentences imposed in similar cases. We note the sentencing range for attempted first degree murder is the same as the sentencing range for attempted second degree murder. As the jurisprudence of sentencing ranges for attempted first degree murder is limited, we will review the attempted second degree murder cases.

In *State v. Butler*, 618 So.2d 572 (La.App. 2 Cir.), *writ denied*, 624 So.2d 1226 (La.1993), the twenty-two-year-old defendant fired multiple shots at a crowd of people after a high school football game and was subsequently convicted of two counts of attempted first degree murder. The trial court sentenced the defendant to thirty years at hard labor on each count. The defendant appealed, arguing that his sentences were excessive and that the trial court failed to consider any mitigating circumstances, such as his age and lack of criminal history. The second circuit affirmed the defendant's sentences, holding that the upward departure from the sentencing guidelines was warranted due to the defendant deliberately firing five to eight shots into a crowd while yelling gang slogans. *Id*. at 574.

In *State v. Sanders*, 33,778 (La.App. 2 Cir. 10/4/00), 769 So.2d 183, the defendant was convicted of one count of attempted second degree murder and was sentenced to ten years after he shot from inside a vehicle into a crowd of four men. The defendant appealed his sentence, arguing that it was unconstitutional excessive. The second circuit affirmed the defendant's sentence due to the fact the sentence imposed was the bottom of the range and the victim was an unarmed bystander. *Id*. at 188.

46

A review of the above jurisprudence shows no cases wherein the offenders received a sentence as low as Defendant received for each attempted first degree murder, involving a drive-by shooting. Here, the record shows that the trial court, after properly considering the factors pursuant to La.Code Crim.P. art. 894.1, sentenced Defendant to eighteen years at hard labor, which falls at the lower end of the sentencing range, and further ordered all sentences were to run concurrently and not consecutively.

Therefore, we find Defendant's sentences are not unconstitutionally excessive, considering they are within the lower range of the statutory sentencing range, there are no cases of other offenders having been sentenced as leniently as Defendant, and all sentences are ordered to run concurrently. As such, we find the trial court did not abuse its broad discretion and the record supports the sentences ordered by the trial court. Thus, we find this assignment of error lacks merit.

## DECREE

Defendant's convictions and sentences are affirmed. Additionally, the trial court is instructed to inform Defendant of the correct provisions of article 930.8 by sending appropriate written notice to him within ten (10) days of the rendition of this opinion and to file written proof that Defendant received the notice in the record of the proceedings. *State v. Green*, 21-14, p. 4 (La.App. 3 Cir. 10/27/21), 329 So.3d 917.

**AFFIRMED.**